No. 02-718

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 63

IN THE MATTER OF,

C.T.P.,

    A Youth Under the Age of 18.

APPEAL FROM:    District Court of the First Judicial District,
In and for the County of Broadwater, Cause No. DJ 2002-01
The Honorable Thomas C. Honzel, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Charles E. Petaja, Attorney at Law, Helena, Montana

    For Respondent:

        Hon. Mike McGrath, Montana Attorney General, Jennifer Anders, Assistant
Attorney General, Helena, Montana; John T. Flynn, Broadwater County
Attorney, Townsend, Montana

Submitted on Briefs:  June 26, 2003

Decided:  March 16, 2004

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1    The State of Montana filed a Youth Petition against C.T.P., a minor, in the Youth Court for the First Judicial District Youth Court, Broadwater County. The petition charged C.T.P. with one count of burglary, and two counts of criminal mischief. After a bench trial, the Youth Court determined C.T.P. committed two counts of criminal mischief, adjudicated him a delinquent youth, required him to pay restitution, and placed him on probation. C.T.P. appeals the Youth Court's Order and Sentence. We reverse the decision of the Youth Court.

## ISSUES

¶2    C.T.P. presents the following issues on appeal:

¶3    1. Did the Youth Court abuse its discretion when it admitted evidence which was seized from C.T.P. without a warrant?

¶4    2. Did the Youth Court commit "plain error" by admitting C.T.P.'s extrajudicial statements?

¶5    3. Was there sufficient evidence to support the Youth Court's adjudication of C.T.P. as a delinquent youth?

## FACTUAL AND PROCEDURAL BACKGROUND

¶6    Chuck and Vicki Harvey live next to the Old Baldy Golf Course, near Townsend, Montana. On July 23, 2001, the Harveys were awakened at 3:00 a.m. by noise from the golf course. From their window they saw golf carts "tearing around" the course. Chuck called the police and investigated on foot, while Vicki drove to the golf course entrance. Neither of them saw anyone leave the course. After Deputy Travis Starck arrived, Vicki noticed a

2

pickup truck in the parking lot of a nearby softball field. She told Starck about the truck, and he investigated.

¶7 The softball field parking lot is less than one-half mile away from the golf course, with an overgrown field in between. Starck found the truck and ran the plates, identifying Wendy Lancaster as the owner. He discovered that the truck's engine was still warm. He also examined the ground around the truck and found three sets of footprints leading away from it. He lost the prints at the edge of the overgrown field. He returned to the golf course and secured the area until the morning shift arrived.

¶8 That morning, Deputy Wynn Meehan reviewed the damage with the golf course manager. They found distinct sets of footprints around the rental carts, and a footprint on the door to a maintenance building, which had been kicked in. Meehan photographed the damage, the footprints, and the parking lot. Sheriff Richard Thompson followed the footprints from the truck to a point in the field where he lost them. Deeper in the field, he found a particle mask.

¶9 The footprints that led from the truck's driver's side door looked similar to the footprint on the maintenance building door. One of the sets of footprints leading from the truck's passenger side had two oval markings in the ball area and one oval marking on the heel. These prints were similar to a print found near the rental carts.

¶10    A reserve officer stayed in the area of the parking lot to watch the truck. Around noon that day, James Lancaster and C.T.P. arrived at the softball field parking lot and wanted to get into the truck. Meehan arrived shortly thereafter with a search warrant for the truck. C.T.P. told him that he wanted to retrieve a baseball hat which he had left in the truck the day before. Meehan searched the truck pursuant to the search warrant, and found particle masks that were later determined to be a match to the one retrieved from the field. He questioned C.T.P. briefly, allowed him to retrieve his hat, and then transported him to the sheriff's office.

¶11    C.T.P. was interviewed in the sheriff's office by Meehan, Thompson, and Starck. At the interview, C.T.P. was wearing grass-stained jeans and tennis shoes. He told the officers that he had ridden to Townsend with Lancaster that morning. He declined to explain where the grass stains on his pants originated. After the interview, Meehan and Juvenile Probation Officer Shelly Richtmyer drove C.T.P. home. When they dropped him off, they asked him if they could have his shoes and jeans. He gave both to the officers.

¶12    At trial, C.T.P.'s mother testified that he was at home with her on the night of July 22, 2001. She said they watched television until she went to bed around 11:00 p.m. She said C.T.P. got up at 7:30 a.m. on July 23, and she drove him to Townsend and dropped him off at the bank. She was supposed to pick him up in Townsend around 1:30 p.m., but he was not at their pre-arranged meeting place. She went home and discovered that the officers had dropped him off. That was when she learned of his alleged involvement in the golf course incident.

4

¶13    After a hearing, the Youth Court adjudged C.T.P. a delinquent youth, and guilty of two counts of criminal mischief. The Youth Court placed C.T.P. on probation and ordered him to: pay $3,500.00 restitution; perform community service; attend an educational program; and follow other probation requirements. C.T.P. appeals from the Order and Sentence.

## STANDARD OF REVIEW

¶14    Issues pertaining to the admissibility of evidence are within the discretion of the trial courts, and unless an abuse of discretion is shown, such determination will not be disturbed. *State v. DuBray*, 2003 MT 255, ¶ 38, 317 Mont. 377, ¶ 38, 77 P.3d 247, ¶ 38.

¶15    This Court will consider a "plain error" review for alleged errors falling outside the constraints of § 46-20-701(2), MCA, when no contemporaneous objection was made, if the alleged error or errors implicate a defendant's fundamental constitutional rights and if our failure to review the claimed error may result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process. *State v. Finley* (1996), 276 Mont. 126, 137, 915 P.2d 208, 215 (overruled in part on other grounds by *State v. Gallagher*, 2001 MT 39, 304 Mont. 215, 19 P.3d 817).

¶16    We review the sufficiency of evidence to support a conviction by viewing the evidence in a light most favorable to the prosecution and then determining whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Earl*, 2003 MT 158, ¶ 32, 316 Mont. 263, ¶ 32, 71 P.3d 1201,

5

¶32.

## DISCUSSION

## ISSUE ONE

¶17    Did the Youth Court abuse its discretion when it admitted evidence which was seized from C.T.P. without a warrant?

¶18    After Meehan questioned C.T.P. in the parking lot, he transported C.T.P. to the sheriff's office, where Meehan, Starck, and Thompson continued to question him. Meehan examined C.T.P.'s shoes and noted that their soles were not inconsistent with the footprints which had been found leading away from the pick-up truck and on the golf course. The officers drove C.T.P. home, and when they arrived at his residence they asked him for his shoes and jeans, which C.T.P. relinquished.

¶19    Neither of C.T.P.'s parents were home when the officers arrived there, and the officers did not contact them or seek their consent to the seizure. It is further undisputed that the officers made no attempt to contact C.T.P.'s parents during the time he was interviewed at the sheriff's office. C.T.P's mother testified at trial that she did not learn that he had been questioned by the police until she drove home and discovered that the officers had dropped him off.

¶20    During Meehan's testimony at trial, C.T.P. objected to the admission into evidence of the shoes and jeans on the grounds that they were not seized pursuant to a search warrant, and that C.T.P.'s parents did not give the necessary consent to their seizure. The state argued that the motion was untimely, and that C.T.P. was "capable of consenting and volunteering."

6

The Youth Court overruled the objection.

¶21 C.T.P. argues that this Court uses a "totality of the circumstances" test to determine whether or not a juvenile has effectively waived his rights or effected consent (as articulated in *Evans v. Montana 11th Judicial District Court*, 2000 MT 38, ¶ 22, 298 Mont. 279, ¶ 22, 995 P.2d 455, ¶ 22), and that the Youth Court made no determination of the totality of the circumstances, nor did it determine whether he had been Mirandized. He claims he was not Mirandized, and that the record does not demonstrate that Miranda warnings were given.

¶22 The State responds that this Court should not consider C.T.P.'s objection to the admission of the evidence because he failed to file a timely, written motion to suppress, but instead objected for the first time at trial. The State argues that, per § 46-13-302, MCA (2001), the time for the Youth Court to hear the merits of such a motion would have been at the omnibus hearing, and that C.T.P.'s objection during the trial was properly overruled as untimely.

¶23 C.T.P. replies that under § 41-5-1415, MCA (2001), illegally seized material may not be received into evidence to establish the allegations of a petition against a youth and thus the timeliness of his objection is not at issue. C.T.P. claims that the State failed to prove that the seized shoes and jeans were legally obtained, as they were not taken pursuant to a search warrant and the record does not indicate that C.T.P. was advised of his rights or gave an informed waiver to his right to have his parents contacted prior to the relinquishment of his clothing. C.T.P. also states that the Youth Court had failed to schedule an omnibus hearing in his case, so he did not have that opportunity to present a motion to suppress.

7

¶24 Under the Montana Youth Court Act, a youth taken into custody for questioning upon a matter that could result in allegations that the youth is delinquent *must* be advised of his right against self-incrimination and his right to counsel, and the youth's parents *must* be immediately notified by the investigating officer. Section 41-5-331(1), MCA (2001). A youth who is 16 years of age or older may make an effective waiver of these rights. Section 41-5-331(2), MCA (2001). (Emphasis added.)

¶25 This Court, in considering waiver and consent by juveniles, has adopted the "totality of the circumstances" test. We held in *Evans* that a determination of voluntariness must take into account the following factors: (1) the defendant's age and level of education; (2) whether the defendant was advised of his rights; (3) the defendant's prior experience with the criminal justice system; (4) the defendant's background and experience; and (5) the defendant's demeanor, coherence, articulateness, and capacity to make full use of his faculties. *Evans,* ¶ 22.

¶26 At the time of questioning, C.T.P. was 17 years old. The State concedes that the record is silent as to whether or not C.T.P. was advised of his rights, or whether he effectively waived them. The State also does not dispute that C.T.P. was "in custody" at the time of the questioning.

¶27 The record does not establish that the court even considered the remaining three factors of the *Evans* test when it determined that C.T.P. voluntarily produced his shoes and jeans. There is no mention of his familiarity with the system or of his background, experience or demeanor. Moreover, the record indicates that his parents were not contacted when he was taken into custody, and that no efforts were made to contact them before he was questioned, or before the officers seized his shoes and jeans. Thus, the record both demonstrates that the mandatory provisions of § 41-5-331(2), MCA, were not fulfilled by the investigating officers, and that the court failed to take account of the factors set forth in *Evans* when it determined that C.T.P.'s relinquishment of his clothing was voluntary.

¶28 As to the timing and manner of C.T.P.'s objection to the admission of the shoes and jeans, it is undisputed that an omnibus hearing was not held. While the State argues that the motion to suppress should have been submitted in writing before the Youth Court hearing, the State does not then argue that it would have prevailed on the merits had C.T.P. presented the motion in that manner. In other words, there was no tactical advantage given to C.T.P. by waiting until the hearing to move to suppress the evidence. Given the custodial nature of the interrogation, the lack of informed consent and waiver as reflected in the record, and the lack of an omnibus hearing, the timing and manner of C.T.P.'s objection is of secondary importance. The fact is that he registered the appropriate objections to the admission of the shoes and jeans.

¶29 Because the investigating officers failed to comply with the mandatory provisions of § 41-5-331(1), MCA, as set forth above, and because the District Court failed to give due consideration to the totality of the circumstances when deciding to admit the disputed evidence, we conclude the Youth Court abused its discretion when it admitted the seized shoes and jeans into evidence over C.T.P.'s objection.

## ISSUE TWO

¶30 Did the Youth Court commit "plain error" by admitting C.T.P.'s extrajudicial statements?

¶31 C.T.P. raises the argument, for the first time on appeal, that it was "plain error" for the Youth Court to have allowed Meehan to testify that C.T.P. stated that he had come to town with Lancaster that morning. At the Youth Court hearing, C.T.P.'s counsel did not object to the admission of C.T.P.'s statements to the officers. C.T.P. urges this Court to consider his argument on the grounds that it was "plain error" for the Youth Court to have admitted and considered this testimony.

¶32 According to C.T.P., Meehan testified that he asked C.T.P. how his jeans had gotten grass-stained, and C.T.P. did not give him an explanation. Although C.T.P.'s silence was not referred to by the Youth Court in its findings, C.T.P. argues that the Prosecutor was improperly allowed to "bolster his otherwise weak circumstantial case" by commenting that C.T.P.'s failure to explain the grass stains was evidence that the stains had come about by way of involvement in the golf course vandalism.

¶33 C.T.P. argues that the statements he made, or did not make, during the questioning

by the officers, are inadmissible. As already indicated, the record is silent as to whether C.T.P. was read his rights and whether he specifically waived either an attorney's or his parents' presence when he told the officers how he was transported to Townsend that morning.

¶34 The State argues that C.T.P. did not object at trial to the testimony regarding what he did or did not say to the officers, and that C.T.P., at seventeen years of age, was old enough to have effectively waived his right to counsel. While the State concedes that the record is silent as to whether or not C.T.P. was Mirandized and informed of his right to counsel, it argues that C.T.P. did not file a timely, written motion objecting to the admission of his statements, and therefore C.T.P. did not give the State the opportunity to refute his claim and demonstrate that the statements were made voluntarily. The State also argues that C.T.P. is unable to meet the statutory conditions under which a new argument may be considered on appeal, as set forth in § 46-20-701(2), MCA.

¶35 Under § 46-20-701(2), MCA, "A claim alleging an error affecting . . . constitutional rights may not be noticed on appeal if the alleged error was not objected to . . ." unless certain factors are met which C.T.P. concedes were not met in this case. C.T.P., however, points to case law in which we held that this statute does not supercede the common law doctrine of "plain error." *Finley*, 276 Mont. 126, 915 P.2d 208. In *Finley* we acknowledged the constraints of § 46-20-701(2), MCA, but concluded that it would be appropriate to "discretionarily review claimed errors that implicate a criminal defendant's fundamental constitutional rights, even if no contemporaneous objection is made . . . where failing to

11

review the claimed error at issue may result in a manifest miscarriage of justice, may leave unsettled the question of the fundamental fairness of the trial or proceedings, or may compromise the integrity of the judicial process." *Finley*, 276 Mont. at 137, 915 P.2d at 215.

¶36 In *Finley*, the prosecutor commented that Finley had not come up with an explanation for his actions until he testified on his own behalf at trial. On appeal, Finley conceded that his attorney did not preserve this issue for appeal, and that he could not meet the requirements of § 46-20-701(2), MCA, but argued that under the common law doctrine of plain error, his constitutional rights were violated by the prosecutor's improper comments on Finley's right to remain silent. This Court agreed that the fundamental fairness of the trial was brought into question, and could not be left unsettled even though Finley's counsel failed to preserve the issue for appeal. *Finley*, 276 Mont. at 138, 915 P.2d at 216.

¶37 While C.T.P. was in custody, Meehan asked him the apparently innocuous question of how he had gotten to Townsend that morning. His answer, that Lancaster drove him there, was later to become pivotal in the Youth Court's findings in that it contradicted C.T.P.'s mother's testimony that she had driven him to town. In its Order, the Youth Court concluded,

> "Although [C.T.P.'s mother] testified she took her son home around 9 p.m. on July 22, 2001, there is a major conflict between her testimony and the testimony of Deputy Meehan as to when and how the Youth got to Townsend the morning of July 23, 2001. The deputy's testimony is much more credible and the rest of [C.T.P.'s mother's] testimony is suspect."

12

¶38    The introduction of C.T.P.'s statement to the officer had a profound impact on the Youth Court's findings and conclusions, as it resulted in the Youth Court calling into question the credibility of C.T.P.'s mother's testimony in its entirety.  Moreover, it was also argued by the State during the Youth Court hearing that C.T.P. did not offer an explanation as to how his jeans became grass-stained.  Thus, C.T.P.'s statements and explanations or lack thereof, elicited without advice of C.T.P.'s Miranda rights, were arguably critical to his conviction.

¶39    C.T.P. had mandatory statutory rights under §§ 41-5-331 and 41-5-1415, MCA, that were simply ignored.  Moreover, these were fundamental constitutional rights.  Article II, Sections 24 and 25 of the Montana Constitution, guarantee the right to counsel and the right to be free from self-incrimination.  Montana youths are constitutionally guaranteed the same fundamental rights as adults.  Art. II, Sec. 15, Mont. Const.  Under § 41-5-331, MCA, a youth *must* be advised of his right against self-incrimination and his right to counsel, and the record does not reflect that this was done for C.T.P.  We note further that, under § 41-5-1415(1), MCA, an extrajudicial statement that would be constitutionally inadmissible in a criminal matter may not be received into evidence in a proceeding which alleges that a youth is delinquent.

¶40    Thus, we choose to consider C.T.P.'s argument under the common law doctrine of plain error, as C.T.P.'s fundamental constitutional right against self-incrimination and the right to counsel were violated in this case.  Our review of the record shows an absence of evidence that C.T.P. was ever advised of his rights; he was thus unable to effectively waive

13

them. Furthermore, the statutory provisions of the Youth Court Act were ignored when these constitutionally infirm extrajudicial statements were allowed into evidence. We conclude that to ignore these violations would ". . . leave unsettled the question of the fundamental fairness of the trial or proceedings." *Finley*, 276 Mont. at 137, 915 P.2d at 215. We therefore conclude that the Youth Court erroneously allowed into evidence C.T.P.'s statement of how he was transported to Townsend on the morning of July 23, 2001, and C.T.P.'s failure to give an explanation for the grass stains on his jeans.

### ISSUE THREE

¶41 Was there sufficient evidence to support the Youth Court's finding that C.T.P. committed the offense of criminal mischief?

¶42 C.T.P. argues that there was not sufficient *admissible* evidence to support his conviction in the Youth Court. Because we have already determined to reverse the decision of the Youth Court based on our resolution of the foregoing issues, we decline to reach this issue.

### CONCLUSION

¶43 For the foregoing reasons, we reverse the decision of the Youth Court.


/S/ PATRICIA O. COTTER



We Concur:

14

/S/ JAMES C. NELSON
/S/ JIM REGNIER
/S/ W. WILLIAM LEAPHART

Justice John Warner Dissenting.

¶44 I must dissent from the decision to reverse the judgment. The Youth Court did not abuse its discretion in admitting the youth's shoes into evidence, and even if the shoes should not have been admitted, such error was totally harmless. Likewise, the admission of the youth's statement concerning how he got to town the morning after the vandalism occurred was not error, much less plain error.

¶45 The Youth Court did not err in sustaining the State's objection to the admission of the youth's shoes because the youth's objection was, indeed, untimely.

¶46 In this case, the youth did not move to suppress any evidence prior to trial. Then, at trial, to the surprise of the prosecution, the youth's counsel moved to exclude the shoes stating that they had been illegally seized. The State argued that the motion was untimely and the trial judge agreed. Now, on appeal, the youth argues that the Youth Court Act does not require him to file any pretrial motions for suppression of evidence. The youth believes, and the Court agrees, that § 41-5-1415, MCA, gives him a statutory rule of inadmissibility where evidence is alleged during the trial to have been illegally seized. The Court then goes on to say that by not making the objection prior to trial the youth gained no tactical advantage. Nothing could be farther from the truth. The State had no reason to believe a motion to suppress was coming, and naturally was unprepared to hold a hearing on the motion right in the middle of the trial. Nor was the Youth Court prepared. The essence of

16

today's decision is that it is the duty of the Youth Court to ensure that any evidence that is admitted was legally obtained, whether the youth makes a timely objection or not. This argument places the entire procedural burden on the trial court and on the State.

¶47 Section 46-13-101, MCA, a part of the Criminal Procedural Code, requires a motion which raises issues that can be resolved before trial be in writing, and be raised at or prior to an omnibus hearing. The Legislature has not explicitly addressed the applicability or non-applicability of portions of the Montana Criminal Procedural Code, in Title 46, MCA, to the Youth Court Act. Though both the Criminal Procedural Code and the Youth Court Act make repeated references to one another, neither states absolutely that an accused youth must follow the provisions of the Criminal Procedural Code in its entirety. Likewise, this Court has not made an express finding that a juvenile defendant must adhere to § 46-13-101, MCA, if he wishes evidence suppressed. Implicitly, however, this Court's decisions reflect an acknowledgment that juvenile defendants are bound to follow portions of the Criminal Procedural Code with respect to pretrial motions and the conduct of trials. In *Matter of J.W.K.* (1986), 223 Mont. 1, 724 P.2d 164, the youth filed a motion to suppress his confession on the first day of trial. This Court held that the filing violated § 46-13-301, MCA. The Court also held that the prosecution had failed to object to the timeliness of the motion and had, therefore, waived its right to object under § 46-20-104, MCA. In *In re Stevenson* (1975), 167 Mont. 220, 538 P.2d 5, a motion was brought in juvenile court to transfer a Youth Court proceeding to adult court, and a hearing was had on the motion. On appeal, the youth objected to a statement that had been admitted into evidence without objection. This Court declined to consider the objection on appeal because the statement had

17

not been timely objected to at the hearing. These holdings evidence an implicit acceptance of use of portions of Title 46, MCA, in a Youth Court hearing. I would make explicit our prior implicit acceptance of the provisions of Title 46, Chapter 13, MCA, as they relate to the suppression of evidence, and hold that they must be followed in Youth Court proceedings with respect to legal questions which may be resolved prior to the hearing. Specifically, motions to suppress evidence and motions to suppress extrajudicial statements must be made prior to trial in Youth Court matters.

¶48 Perhaps, because counsel on appeal, having researched the issue and anticipated this Court would agree that a pretrial motion to suppress should have been made, the youth now attempts to blame the Youth Court for not setting an omnibus hearing at which counsel could have made the required written motion. Section 46-13-110, MCA, another part of the Criminal Procedural Code, states that in a criminal matter, the court "shall" hold an omnibus hearing. Not only does the youth present an inconsistent argument, that he may take advantage of one part of Title 46 and ignore another, the Youth Court Act specifically does not require an omnibus hearing unless the adjudicatory hearing will be held before a jury. § 41-5-1502(3), MCA.

¶49 It was reasonable for the Legislature to omit the omnibus hearing requirement for bench trials from the Youth Court Act because it also gave Youth Court matters a priority in scheduling. Section 41-5-1502(1), MCA. Adding an omnibus hearing requirement to a trial before the Youth Court judge, without a jury, would greatly lengthen the time it would take the matter to get to trial. This should not excuse the youth, however, from bringing his evidentiary concerns before the court prior to the adjudicatory hearing. The record in this

18

case indicates that the Youth Court held the initial plea hearing on February 1, 2002. The adjudicatory hearing did not occur until March 27, 2002. The youth had almost two months in which he could have notified the State and the Youth Court of his intention to raise an evidentiary objection at trial. He did not. I agree with the Youth Court and would hold that the objection was untimely.

¶50 While I disagree with the Court that the shoes should have been excluded; even if they were improperly admitted into evidence any error is completely harmless. At trial, the prosecutor first questioned Deputy Meehan at length about the shoes and there was no objection, and no motion to strike the testimony or to disregard it. Photographs of the shoes as well as of the shoe prints found around the pickup truck and at the golf course were stipulated into evidence and testified to without objection. Deputy Meehan then testified as to his opinion about what the shoe prints meant, again without objection. At the end of Deputy Meehan's testimony, after all the relevant evidence was before the Youth Court, the prosecutor offered the shoes into evidence. The court asked if there were any objections. At this point, the youth's counsel finally objected, and then only to admission of the shoes themselves, on grounds that they were taken from the youth without a valid search warrant. By that time, the prosecutor already had in evidence all relevant testimony concerning the shoes. The admission of the shoes themselves was meaningless. The youth still makes no objection to any of the testimony that actually points to his guilt. Thus, any error in admitting the shoes into evidence is clearly harmless.

¶51 While the Court inappropriately shrugs off requirements for making pretrial evidentiary motions, and reduces to "secondary" status Rule 103(a)(1), M.R.Evid., requiring

19

an objection to evidence, or moving to strike evidence already admitted, it errs even further in invoking the plain error doctrine to reverse the judgment because the Youth Court considered a statement by the youth that he came to town with a friend, and a statement that he did not know how he got grass stains on his pants.

¶52 The Court does correctly cite *Finley* for the proposition that we will conduct a plain error review when such error may result in a manifest miscarriage of justice, leave unsettled the fundamental fairness of the trial, or compromise the integrity of the judicial process. *Finley*, at 137. However, the Court fails to note the limiting language in *Finley* that plain error doctrine should only be used sparingly, on a case-by-case basis. *Finley*, at 138. *See also State v. Daniels*, 2003 MT 247, 317 Mont. 331, 77 P.3d 224.

¶53 In this case it is unlikely that there was any error, much less plain error. In proceedings prior to commencement of the trial, defense counsel advised the Youth Court Judge, who was also to be the fact finder, that the defense was that the youth did not commit the offense and that he had an alibi. Deputy Meehan was called as a witness by the prosecutor and testified as expected, without objection, that C.T.P. told him he came the twenty miles to town with a friend the morning after the offense was committed. Then, on cross examination, C.T.P.'s counsel twice elicited testimony from the deputy that his client had denied that he was in Townsend when the offense was committed. By this simple device C.T.P.'s testimony, that he was in Radersberg at the time the offense was committed in Townsend, came into evidence. This was accomplished without the youth having to take the witness stand and subject himself to cross-examination. Counsel likely accepted C.T.P.'s further statement that he did not know why grass stains were on his pants. Not knowing

20

how one's pants got grass stained is hardly evidence of guilt sufficient to cause counsel to forego evidence of an unequivocal denial of guilt along with setting up an alibi. This is a sound trial strategy. Naturally, there was no objection at the time.

¶54   Later, C.T.P.'s mother was called by the defense and provided an alibi by saying he was home the night the offense was committed. Unfortunately for the defense, she contradicted her son on how he got to town the next morning. This cast doubt on the rest of her testimony. But, by then, it was a bit late to object to C.T.P.'s statements, and there was no valid objection to the mother's inconsistent statement. Now, by crying plain error where there was no error at all, counsel on appeal successfully enlists this Court's aid in defeating the adversary process.

¶55   What would the Court have the trial courts do? Become clairvoyant and s*ua sponte* reject evidence to which no objection was made, but that this Court might later find was admitted in plain error? *Sua sponte* grant a mistrial after a trial strategy goes awry and an alibi witness forgets her lines? These questions, while rhetorical, defy an answer. It appears that Chief Justice Gray's fear, expressed in *Finley,* has come true and there really are no limitations on the plain error doctrine other than what this Court unpredictably feels from time to time should cause a reversal. *Finley,* at 149. Every convicted youth or defendant may as well appeal.

¶56   The admission of the shoes into evidence was not error, and even if it was, such error was harmless. It is very likely that the statements of C.T.P. were admitted as a part of the trial strategy. In the unlikely event that admission of such statements was not planned by the youth's counsel, plain error review should not act as "a prophylactic for careless counsel."

21

*State v. Price*, 2002 MT 284, ¶ 23, 312 Mont. 458, ¶ 23, 59 P.3d 1122, ¶ 23.  Plain error review is, by its very nature, a subjective process engaged in by an appellate court.  Since we have decided to exercise our inherent power to engage in this process, we must be extremely circumspect in applying it and disciplined enough to refrain from creating chaos.  In my view, the Court has done neither in this case.  The evidence in question here is not of a nature that its admission may result in a manifest miscarriage of justice, leave unsettled the fundamental fairness of the trial, or compromise the integrity of the judicial process, and plain error review should be summarily denied.

¶57    I dissent from the Court's decision to conduct plain error review and to reverse the judgment.  I would affirm the District Court.

/S/ JOHN WARNER

Chief Justice Gray and Justice Rice join in the foregoing dissent.

/S/ KARLA M. GRAY
/S/ JIM RICE