No. 05-199

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 5

STATE OF MONTANA,

Plaintiff and Respondent,

v.

DANIEL N. McKEE,

Defendant and Appellant.

APPEAL FROM:   The District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC 2004-79,
Honorable Douglas G. Harkin, Presiding Judge

COUNSEL OF RECORD:

For Appellant:

Michael J. Sherwood, Michael J. Sherwood P.C., Missoula, Montana

For Respondent:

Honorable Mike McGrath, Attorney General; John Paulson,
Assistant Attorney General, Helena, Montana

Fred Van Valkenburg, County Attorney; Suzy Boylan-Moore,
Deputy County Attorney, Missoula, Montana

Submitted on Briefs:  November 9, 2005
Decided:  January 10, 2006

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 On February 22, 2005, subsequent to a plea of guilty, the District Court sentenced sixteen-year-old Danny McKee to ten years with the Department of Corrections, with five years suspended, on three counts of Assault with a Weapon, a felony, as specified in § 45-5-213, MCA. The convictions are to run concurrently. McKee appeals from the court's judgment. We affirm in part and reverse in part.

¶2 We restate the issues as follows:

¶3 1. Did the District Court err when it denied McKee's motion to dismiss the information?

¶4 2. Did the District Court err when it denied McKee's motion to suppress admissions he made prior to the time law enforcement contacted his parents?

¶5 3. Did the District Court err when it denied McKee's motion to suppress his admission made at the scene of the investigatory stop?

## BACKGROUND

¶6 On the evening of February 4, 2004, officers responded to a report that a female bicyclist had been hit in the head by a blunt object as she rode home on River Road in Missoula, Montana. The victim explained that she had been riding her bicycle home from work when a car approached from behind and the passenger in the front seat struck her head with what she described as a shovel or a bat, knocking her to the ground. The victim, who was wearing a helmet, suffered a concussion. The victim told the police that she did not see who did it, but knew the assailants were in a blue car.

2

¶7     Shortly thereafter, law enforcement received a report of a male bicyclist who had been riding in an alley north of Eighth Street when a blue car pulled up slowly behind him. He felt a blunt object, which he believed might be a bat, narrowly miss striking him, just grazing the hat on his head. The victim saw the person who struck him hanging out the passenger car window. The victim also reported that had the bat not narrowly missed hitting him, he could have been seriously injured.

¶8     A third victim called the police that same day, reporting that he had been threatened by two juveniles at the Holiday Store at Russell and Third Streets. He reported that two males had asked him to buy them beer, to which he responded in the negative. The man went inside to tell the store staff, and as he exited, the two juveniles were sitting in a blue car; the passenger told him, "You're a dead man." A few minutes later the youths came up behind the man in their vehicle and the passenger swung a bat at him several times. The victim had to repeatedly dodge the bat to keep from getting hit.

¶9     Officer Ken Guy responded to the area and located a vehicle matching the description, with two males inside. Noting an inoperative rear tail light, Officer Guy turned his patrol car around to stop the car, at which point the vehicle sped off. Officer Guy followed the car for several blocks and because of snow tracks was able to locate where it had been driven into an alley, over a curb, and into a yard. Officer Guy arrived just as two males exited a blue Ford Tempo; he ordered the juveniles to stop and stand facing the side of a nearby garage while he called for backup. The assailants identified themselves as Jacob Elam and defendant, Daniel McKee, fifteen and sixteen-years-old, respectively.

3

¶10    At the evidentiary hearing, Officer Hoffman testified that upon arriving at the scene, he approached McKee and directed him to walk with him a distance from Elam and asked him what they had been doing that night.  In talking with McKee, Officer Hoffman stated that a woman had reportedly been hit by a baseball bat or some blunt instrument and knocked off her bike by two males in a blue car.  Officer Hoffman further advised McKee that he, Elam and their vehicle matched the reported description.  McKee responded by stating: "I only hit one of them."  Officer Hoffman inquired as to whether McKee's response meant that Elam had hit others, to which McKee did not respond.  At the evidentiary hearing, Officer Hoffman conceded that he used McKee's admissions to obtain information from Elam. Throughout this interaction, officers never advised McKee of his *Miranda* rights.

¶11    McKee and Elam were placed under arrest and transported to Missoula City Police Department for further questioning.  Officers took no steps to contact McKee's parents; nor did they inform McKee of his right to have officers notify his parents of his whereabouts.  An officer on duty that evening later testified that law enforcement had no obligation to call McKee's parents, nor did it have to obtain a waiver from McKee with regard to contacting his mother and father.

¶12    Around midnight, two officers took McKee into a room, obtained a waiver of his *Miranda* rights, and interrogated him for approximately an hour and a half.  The officers successfully obtained McKee's admissions that he had struck a woman with a small wooden bat while holding it out the window of a moving vehicle driven by Elam.  McKee also admitted that he had tried to strike two other males in a similar fashion.  At approximately

4

1:30 a.m. police contacted McKee's father, who subsequently called his ex-wife to inform her that their son was in police custody. Based upon McKee's admissions and those made by Elam, the police further detained McKee, transferring him to Missoula County Detention Center. The next day McKee was transported to Missoula County District Court where the court signed a detention order.

¶13    The prosecution filed an affidavit and motion to charge McKee as an adult by way of information with three counts of felony assault with a weapon. McKee did not receive a hearing regarding whether he should be transferred to Youth Court prior to the filing of the information; instead, the court provided McKee with a hearing eight days after the State charged him as an adult.

¶14    McKee filed consolidated pretrial motions which included: (1) a pre-trial motion pursuant to § 46-13-101, MCA, to dismiss the information charging McKee as an adult without first filing in Youth Court and conducting a transfer hearing; (2) a motion to suppress any statements made by McKee after the stop and any evidence that was a product of those statements; and (3) a motion to suppress McKee's statements obtained by officers at the police station without notifying his parents. After the evidentiary hearing, the District Court denied all three of McKee's pre-trial motions.

¶15    McKee subsequently entered a conditional plea agreement which allowed him to appeal all adverse pre-trial rulings by the court. He then pled guilty to all three counts of felony assault. The District Court sentenced McKee as an adult to ten years with the

Department of Corrections, with five years suspended on each count to run concurrently. McKee appeals the court's adverse pre-trial rulings.

**STANDARD OF REVIEW**

¶16 "The grant or denial of a motion to dismiss in a criminal case is a question of law which we review *de novo* on appeal. Our standard of review is plenary, and we determine whether a district court's conclusion is correct." *State v. Mallak*, 2005 MT 49, ¶ 13, 326 Mont. 165, ¶ 13, 109 P.3d 209, ¶ 13 (citation omitted).

¶17 We review a district court's denial of a motion to suppress evidence by determining whether the district court's findings of fact are clearly erroneous and whether those findings were correctly applied as a matter of law. *State v. McCollom*, 2005 MT 61, ¶ 7, 326 Mont. 251, ¶ 7, 109 P.3d 215, ¶ 7.

**DISCUSSION**

**Issue 1**

*Did the District Court properly deny McKee's motion to dismiss the information?*

¶18 McKee argues that before the prosecution filed the information, he was entitled to a hearing to determine whether it was appropriate to prosecute him in district court rather than in youth court. To support his argument, McKee cites *State v. Butler*, 1999 MT 70, ¶ 32, 294 Mont. 17, ¶ 32, 977 P.2d 1000, ¶ 32, in which this Court held "that the District Court violated Butler's right to due process as guaranteed by the Fourteenth Amendment to the United States Constitution when it allowed the prosecution to file an information in District Court

6

pursuant to § 41-5-206, MCA (1997), without *first* affording Butler a hearing." (Emphasis added.)

¶19 Importantly, at the time we decided *Butler*, the provisions of § 41-5-206, MCA, differed from today's version in that the statute did not include *any* transfer hearing requirement. Because we determined that the decision to prosecute a youth in district court rather than youth court could mean the difference between detaining a minor defendant until age twenty-five or losing his life, we concluded that a decision to transfer a youth to district court "is critically important" warranting a hearing. *Butler*, ¶ 26.

¶20 Subsequent to *Butler*, the Legislature amended § 41-5-206, MCA, to provide in subsection (3) that "[w]ithin 30 days after leave to file the information is granted, the district court shall conduct a hearing to determine whether the matter must be transferred back to the youth court, unless the hearing is waived by the youth or the youth's counsel in writing or on the record." While this provision contradicts *Butler* insofar as it permits a hearing to be held within thirty days *after* the information is filed, rather than prior to a filing, we conclude that the statute satisfies the concern we addressed in *Butler* that due process requires the court to afford a youth "the opportunity with the assistance of counsel to challenge the prosecution's allegations that there was probable cause or that the seriousness of the crime or the interests of the community protection require[] an information to be filed in District Court." *Butler*, ¶ 27. To the extent that *Butler* requires a hearing before filing in district court, it is overruled.

¶21 Because we hold that § 41-5-206(3), MCA, of Montana's Youth Court Act satisfies due process requirements and the District Court complied with this statute by providing McKee, represented by counsel, a full opportunity to present evidence and argument concerning the appropriate forum for the prosecution of his case, we conclude that the District Court did not commit error when it denied McKee's motion to dismiss the information.

**Issue 2**

*Did the District Court err when it denied McKee's motion to suppress admissions he made prior to the time law enforcement contacted his parents?*

¶22 "Under the Montana Youth Court Act, a youth taken into custody for questioning upon a matter that could result in allegations that the youth is delinquent *must* be advised of his right against self-incrimination and his right to counsel, and the youth's parents *must* be immediately notified by the investigating officer." *In the Matter of C.T.P.*, 2004 MT 63, ¶ 24, 320 Mont. 279, ¶ 24, 87 P.3d 399, ¶ 24. Section 41-5-331, MCA, states the following:

> **41-5-331. Rights of youth taken into custody—questioning—waiver of rights**. (1) When a youth is taken into custody for questioning upon a matter that could result in a petition alleging that the youth is either a delinquent youth or a youth in need of intervention, the following requirements must be met:
>
> (a) The youth must be advised of the youth's right against self-incrimination and the youth's right to counsel.
>
> (b) The investigating officer, probation officer, or person assigned to give notice shall immediately notify the parents, guardian, or legal custodian of the youth that the youth has been taken into custody, the reasons for taking the youth into custody, and where the youth is being held. . . .
>
> (2) A youth may waive the rights listed in subsection (1) under the following situations:

8

(a) when the youth is 16 years of age or older, the youth may make an effective waiver[.]

¶23 McKee argues that when law enforcement took him into custody, it should have, pursuant to § 41-5-331(1)(b), MCA, immediately notified his parents or, pursuant to subsection (2)(a), advised him that he could waive the right to parental notification. Because the officers failed to do so, McKee contends that the admissions he made in the three and a half hours prior to the time his parents were notified should have been suppressed by the District Court. The court denied McKee's motion to suppress because it interpreted § 41-5-331, MCA, as providing the *parents*, not the youth, with the right to notification—"the parent notification is not a right that is personal to the youth that requires a waiver."

¶24 The State argues that the District Court correctly interpreted § 41-5-331, MCA, when it denied McKee's motion to suppress. While conceding that subsection (1)(b) of the statute mandates that law enforcement "shall immediately notify the parents" of a youth taken into custody, as well as the reasons for the custody and where the youth is being held, the State argues that this "right" belongs to the parents. The State therefore argues that it was not required to obtain a waiver of parental notification from McKee before the police questioned him. We disagree.

¶25 We interpret § 41-5-331, MCA, as operating in accordance with its title—that is, it protects the "[r]ights of youth taken into custody." Interpreted as a whole, subsection (1) ensures that a youth taken into custody understands his rights; subsection (1)(a) mandates that law enforcement must advise a youth of his right against self-incrimination and his right to counsel, while subsection (1)(b) states that law enforcement "shall immediately notify the

9

parents, guardian, or legal custodian . . . ." These subsections compliment each other, in that the latter allows parents the opportunity to assist their child in deciding whether to waive his or her rights or alternatively, obtain counsel.

¶26 Moreover, we read the right of parental notification as belonging to the youth, not to the parents. The plain language of subsection (2)(a) states that "[a] youth may waive the rights listed in subsection (1) . . . when the youth is 16 years of age or older . . . ." Consequently, the right to parental notification belonged to McKee, not his parents. While McKee signed a written waiver of his right against self-incrimination and his right to counsel, he did not waive his right to parental notification. We therefore conclude that the District Court should have suppressed the statements provided to law enforcement before McKee's parents were notified.

**Issue 3**

*Did the District Court properly deny McKee's motion to suppress his admission made at the scene of the investigatory stop?*

¶27 "The Fifth Amendment to the United States Constitution and Article II, Section 25, of the Montana Constitution provide that no person shall be compelled, in any criminal case, to be a witness against himself." *State v. Olson*, 2003 MT 61, ¶ 13, 314 Mont. 402, ¶ 13, 66 P.3d 297, ¶ 13. In *Miranda v. Arizona* (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, the Supreme Court "held that the prosecution may not use statements that stem from a custodial interrogation of a defendant unless the defendant is warned, prior to questioning, that he has a right to remain silent, that any statement he does make may be used as evidence

10

against him, and that he has a right to the presence of an attorney." *Olson*, ¶ 13 (citing *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612, 16 L.Ed.2d at 706).

¶28 McKee argues that his Fifth Amendment and state constitutional rights were violated when law enforcement inquired as to "what they had been doing," while McKee, at the direction of the officers, stood with his hands on the wall, facing the side of a nearby garage. We have previously held that "[a] person is entitled to *Miranda* warnings only if he or she is subject to a custodial interrogation." *Olson*, ¶ 14 (citing *State v. Elison*, 2000 MT 288, ¶ 27, 302 Mont. 228, ¶ 27, 14 P.3d 456, ¶ 27). A custodial interrogation occurs when there is a significant restriction of personal liberty similar to an arrest—in other words, "if a person has no free right to leave, then the interrogation is custodial." *Olson*, ¶ 15 (citations omitted). This Court examines the following six factors in determining whether or not a custodial interrogation has occurred: (1) place of the interrogation; (2) time of the interrogation; (3) persons present during the interrogation; (4) whether *Miranda* warnings were gratuitously given; (5) the length and mood of the interrogation; and (6) whether or not the suspect was arrested following the interrogation. *Olson*, ¶ 15 (citation omitted).

¶29 In *Olson*, police officers stopped the defendant's vehicle and removed her from the car. An officer approached Olson and informed her that he knew a meth lab had been placed in the trunk of her car. Initially, Olson denied the allegation, but after the officer spoke to her about the health risks of a meth lab, she admitted that the equipment was located in her vehicle. *Olson*, ¶ 8. This Court held that the officer "should have known that his statements were reasonably likely to elicit an incriminating response from Olson" and "because Olson

11

did not receive *Miranda* warnings before she was interrogated by [the officer], the statements she made . . . were obtained in violation of her Fifth Amendment right against self-incrimination, and must be suppressed." *Olson*, ¶ 20.

¶30 In this case, Officer Guy stopped McKee and Elam as they exited their vehicle and directed them to face a garage with their arms and hands on the wall. According to Officer Guy's own admission, at this point the young men were not free to go. When Officer Hoffman arrived at the scene, he directed McKee to walk with him and then elicited incriminating statements from McKee by telling him that he and Elam matched a woman's description of assailants who hit her on the head with a blunt instrument while she was riding her bike. When the prosecution asked Officer Hoffman at the suppression hearing why he asked McKee to walk away with him, Officer Hoffman testified as follows:

> [Officer]: Well, we wanted to keep them separate. A lot of times, just their general eye contact with each other, verbal contact, can change their stories or fabricate a story, so we like to separate potential victims – witnesses or – or suspects.
>
> [Prosecutor]: Okay. And did you have a conversation with him then?
>
> [Officer] Yes.
>
> [Prosecutor]: Okay. Tell us about that.
>
> . . . .
>
> [Officer]: Walked him away. I made him [stand] with his back towards the other subject. I could keep my visual on both of them at that time. And I asked what they had been doing.

¶31 We noted in *Olson* that an "'interrogation' in the context of the Fifth Amendment and Article II, Section 25, of the Montana Constitution, refers not only to express

12

questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Olson*, ¶ 18 (citations and quotations omitted). In analyzing whether an officer's words "are reasonably likely to elicit an incriminating response," we focus on the perception of the suspect, not the intent of the officer. *Olson*, ¶ 18.

¶32 At the time Officer Hoffman directed McKee to walk with him in order to elicit a statement, three armed, badged and uniformed police officers were present at the scene. McKee did not feel free to leave, nor was he. Moreover, Officer Hoffman's testimony illustrates that when he approached McKee the "mood of the investigation" was one which focused on the clear potential that McKee was a suspect and which prompted an incriminating statement from him. After police identified McKee as matching the physical description of the suspects, he was separated by police in order to isolate him from Elam and impede his ability to "fabricate a story." Then, McKee was asked an open-ended question about his activities that night. Finally, he was advised that police were investigating reports of physical assaults. This evidence demonstrates that the officers intended to obtain a statement from McKee about McKee's involvement in the assaults under investigation. As such, a *Miranda* warning was required.

¶33 Given the circumstances surrounding law enforcement's questioning of McKee prior to his arrest and in the absence of *Miranda* warnings, we conclude that an illegal custodial

13

interrogation took place. Consequently, the District Court should have suppressed McKee's admissions.

## CONCLUSION

¶34    We conclude that the District Court did not commit error when it conducted a transfer hearing eight days after the filing of the information, rather than before. However, we conclude that the District Court erred when it failed to suppress the statements McKee provided to law enforcement before his parents were notified and without a waiver of such notification, as well as the evidence obtained by officers prior to McKee's arrest and without *Miranda* warnings. We affirm in part, reverse in part, and remand for further proceedings consistent with this decision.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ BRIAN MORRIS
/S/ PATRICIA O. COTTER
/S/ JIM RICE
/S/ JAMES C. NELSON

14